UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
─────────────────────────────

LUIS A. AVILAS,

        Plaintiff,

   -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

─────────────────────────────

**DECISION and ORDER
No. 6:15-cv-6210(MAT)**

**INTRODUCTION**

Represented by counsel, Luis A. Avilas ("Plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Insurance ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

**BACKGROUND**

**I.   Procedural Status**

Plaintiff protectively filed applications for DIB and SSI on February 16, 2012, alleging disability since June 30, 2011, due to depression, heart disease, high cholesterol, diabetes, and high

blood pressure. T.126-39, 172.[1] After these applications were denied, Plaintiff requested a hearing, which was held before Administrative Law Judge Michael Devlin ("the ALJ") on March 11, 2014, in Rochester, New York. T.29-52. Plaintiff appeared with his attorney and testified, as did impartial vocational expert Carol G. McManus ("the VE"). The ALJ issued a decision on May 9, 2014, finding Plaintiff not disabled under the Act. T.12-24. This decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on February 10, 2015. T.1-5.

Plaintiff timely commenced this action. The parties have filed cross-motions for judgment on the pleadings and supporting memoranda of law, but neither party has filed a reply brief. For the reasons discussed below, the Commissioner's decision is affirmed.

## II.  Summary of the Relevant Medical Evidence

Because Plaintiff does not allege error in connection with the ALJ's assessment of his physical residual functional capacity ("RFC"), the summary below will focus on the medical evidence regarding Plaintiff's mental impairments and alcohol abuse.

---

[1]

Citations to "T." refer to pages from the certified transcript of the administrative record, submitted by the Commissioner in connection with her answer to the complaint.

**A.    Treatment Notes**

Both prior to and after the onset date of June 30, 2011, Plaintiff has had recurrent pancreatitis and multiple hospitalizations due to alcohol intoxication and alcohol dependency, including on September 15, 2006, to September 18, 2006; April 1, 2010, to April 2, 2010; July 6, 2010 to July 12, 2010; and November 7, 2010. See T.238, 412-413, 432, 445-447. For instance, on April 1, 2010, Plaintiff visited the emergency room, complaining of depression and alcohol abuse, with a recent alcohol binge. T.445-48. Upon discharge, Plaintiff was given a prescription for Atvian to ease withdrawal symptoms. T.446-47. Plaintiff also suffered a period of depression in September 2009, during which he was unable to work or concentrate. T.595.

On February 4, 2011, Plaintiff reported to the Emergency Department at Rochester General Hospital ("RGH") in a lethargic, obtunded state with decreased mental status; his speech was slurred, he had tremors, and he smelled of alcohol. T.484. He was treated with Narcan (naloxone). His discharge diagnoses were encephalopathy and acute renal failure. T.489.

From August 16, 2011, to August 17, 2011, Plaintiff was admitted to RGH with symptoms of confusion, dizziness, and upper abdominal pain with nausea after a one-week alcohol binge. T.492, 497. He reported remaining sober for four months after undergoing inpatient alcohol rehabilitation in October 2010. T.497. Initial

assessment was alcohol intoxication and epigastric pain likely secondary to alcohol-induced gastritis. He was treated with benzodiazepine, thiamine, folate, and multivitamins. Inpatient rehabilitation was discussed, but Plaintiff refused, citing a need to return to work. T.499.

About a month later, on September 23, 2011, Plaintiff was admitted to RGH with acute pancreatitis and hypertension. After being sober for about two to three weeks, he began drinking half a liter of rum daily about nine to ten days prior to his admission. T.508. His abdominal pain, which had been mild for four to five days, had become severe the night before his admission. T.516. Plaintiff was treated with MS Contin and Dilaudid for pain control, and discharged on September 29, 2011.

From October 1, 2011, to October 2, 2011, Plaintiff was re-admitted to RGH with complaints of unresolved sharp left upper abdomen quadrant pain. T.517-19. He reported that his health insurance company was refusing to cover pain prescriptions. Examination revealed mild abdominal tenderness in the epigastric area and left upper quadrants. T.525. Although Plaintiff said his last drink had been prior to his September 23rd hospital admission, staff noted he smelled of alcohol. T.517-18. He was held in the emergency room due to alcohol intoxication, and discharged once he was sober. Diagnoses were abdominal pain and possible alcoholic pancreatitis. He was treated with Dilaudid, Percocet, and Ativan.

On December 13, 2011, Plaintiff saw his primary care physician Dr. Hilary Southerland at Culver Medical Group ("CMG") and reported drinking about four alcoholic beverages at a time, though not every day. T.255-56. He was alert, fully oriented, and in no acute distress.

On January 5, 2012, Plaintiff informed Dr. Brett Robbins at CMG that he had passed out at work on December 23, 2011. T.252. He had been found hypotensive with blood pressure in the 70s, and had spent the night in observation. T.252-53.

When Plaintiff followed up with Dr. Robbins on January 19, 2012, after being discharged from the hospital for recurrent alcoholic pancreatitis, he expressed an interest in treatment for alcohol abuse and depression. T.249. Dr. Robbins noted that Plaintiff's main problems were alcoholism with recurrent pancreatitis, uncontrolled hypertension, and high lipids. T.251.

Plaintiff returned to see Dr. Southerland on February 9, 2012, and reported he had not had a drink since his hospitalization in January 2012. T.246, 686. His hypertension and diabetes had improved, but he had difficulty falling asleep and staying asleep most nights. T.246. However, he was feeling much better overall. T.246. Dr. Southerland diagnosed Plaintiff with insomnia and prescribed Ambien. T.247. Plaintiff's alcohol abuse was deemed to be in remission. Id. Dr. Southerland noted that Plaintiff was clearly doing much better with his diabetes and blood pressure

control, with his alcohol abuse currently in remission. T.247. She encouraged him to continue with mental health treatment and consider AA. Id.

On February 21, 2012, Plaintiff had an intake assessment with therapist Shannon Baker ("Ms. Baker") at Rochester Mental Health Center ("RMHC") regarding his depression, alcohol abuse, and related health issues. T.228-31. Plaintiff reported depressive symptoms beginning in 2008, after his ex-wife's new husband murdered her and Plaintiff's 15-year-old daughter. Plaintiff had a history of suicidal ideation, noting that three months earlier he had thoughts of wanting to kill himself and had deeply scratched his arms and legs while intoxicated. T.228. Plaintiff's alcohol binges lasted from two weeks to two months. T.228. His drinking interfered with his job and caused him to be miss a lot of work and have his hours reduced to part-time. He had undergone inpatient and outpatient alcohol treatment in the past, the longest of which was 41-day inpatient program. T.228. Plaintiff explained that he tended to go on drinking binges shortly after completing treatment programs. On examination, Plaintiff had a depressed mood with congruent affect, and fair concentration, insight, and judgment. T.228-29. Ms. Baker diagnosed him with depressive disorder, not otherwise specified ("NOS") and alcohol abuse disorder. T.229.

On March 7, 2012, and March 12, 2012, Plaintiff returned to RMHC for further intake evaluation. T.226-27, 615-16, 619-21. He

reported feeling depressed, having low motivation, not sleeping, and gaining weight. He was attending chemical dependency evening treatment at RMHC. He recognized that his symptoms were interfering with both his social and occupational functioning since he felt unmotivated to work and had been receiving fewer hours at work due to his alcohol abuse. On mental status examination, he had a depressed mood, somewhat poor insight, and appropriate judgment. T.619. Plaintiff expressed a desire to maintain his sobriety and decrease his depressive symptoms. T.620. He reported that his family was his primary support and that he had a good relationship with his family members. T.615. Ms. Baker assessed him with depressive disorder NOS, and alcohol abuse disorder. His treatment plan included individual therapy and medication.

At his next appointment at RMHC was March 19, 2012, he reported that his depression is "episodic" and that he "can go for a month feeling fine and then the depression comes back." T.620. He expressed a desire to reduce depressive symptoms, maintain sobriety, return to full-time employment, and move back to the Bronx.

Dr. Southerland saw Plaintiff on March 22, 2012, and he reported having a glass of wine with dinner, but said he was not drinking liquor or drinking excessively. T.243. His examination was unremarkable. He was advised to cease all alcohol consumption. T.244.

From April 13, 2012, to April 21, 2012, Plaintiff was admitted at Syracuse Behavioral Health for alcohol withdrawal and stabilization services (detoxification). T.558, 560. At admission, his blood alcohol content was .020; he was anxious and numerous withdrawal symptoms including tremors, nausea, malaise, diaphoresis (excessive sweating), irritability, dizziness, rapid heartbeat, depression, and agitation. T.555. He reported sleeping for  only two hours at a time and staying up the rest of the night. T.556. He had night sweats and bad dreams. During his program evaluation, he admitted to self-harming thoughts in the past but no suicide attempts. Plaintiff reported a seven-to-eight-year history of consistent binge drinking (up to two liters of rum on each occasion) interspersed with periods of daily drinking. T.533-34.

On May 4, 2012, Plaintiff saw Ms. Baker at RMHC for therapy. He reported depressive symptoms including low mood, social isolation, increased fatigue, and occasional tearfulness. He said he had recently relapsed and had undergone detoxification. T.625.

On May 29, 2012, Plaintiff saw Dr. Southerland in follow-up, noting that he had relapsed. However, he attended a detoxification program and had not had an alcoholic drink in the past six weeks. T.681-82. He was in no distress, with a normal affect, and linear and appropriate thought.

Plaintiff appeared at RMHC without an appointment on May 30, 2012, and requested help from Ms. Baker, his therapist, in

-8-

completing paperwork. He reported persistent depressive symptoms, including low mood, social isolation, sleeplessness. He admitted increased marijuana use. T.626.

On July 3, 2012, Plaintiff saw nurse practitioner Linda Tantalo ("NP Tantalo") at RMHC. T.627-28, 640-42. He was experiencing increased depressive symptoms but Wellbutrin prescribed by Dr. Southerland was providing some help. His chief complaint was sleeplessness, which had been a problem for the past six or seven years. His longest time abstaining from alcohol was seven months, about three years earlier. On examination, Plaintiff did not display any significant signs of anxiety; he was appropriately dressed, polite, cooperative, with normal speech, organized thought processes, dysphoric mood, full affect, no suicidal ideation, intact memory, fair attention span, fair concentration, and adequate insight and judgment. NP Tantalo prescribed Lunesta for sleeplessness. Plaintiff was not interested in adjusting his Wellbutrin dosage, which remained at 150 mg per day.

Plaintiff returned to Dr. Southerland on July 13, 2012, noting increased depression and fatigue over the past month. T.677-78. He denied any alcohol consumption since April. T.678. On examination, he had a flat affect, depressed mood, and linear and appropriate thought. Id. Dr. Southerland found Plaintiff's depressive symptoms

to be uncontrolled and increased his Wellbutrin dosage to 300 mg per day. Id.

Plaintiff saw NP Tantalo at RMHC on July 31, 2012, for medication management. T.654-55. Plaintiff noted that it was difficult time for him as the anniversary of his daughter's death was the previous week. He had isolated himself and stopped attending group alcohol abuse counseling sessions, but he had resumed attendance and was proud that he had not relapsed. Plaintiff's mood was slightly dysphoric but appropriate overall, his affect was full-range, and his thought processes were organized and logical, with no suicidal ideation. Plaintiff's memory was intact, and his judgment and insight were adequate. Plaintiff's Wellbutrin was continued at 300 mg.

On August 3, 2012, Plaintiff saw Dr. Southerland in follow-up. He reported going to the emergency room the night before. T.675. Although he stated that he continued to experience depression on the increased Wellbutrin, he was sleeping much better with Lunesta. Plaintiff's affect was normal.

On August 10, 2012, Plaintiff saw social worker and certified alcohol and substance abuse counselor Pamela Smith ("Ms. Smith") at RMHC. Currently, he had mild symptoms of depression and lack of motivation. He had relapsed on July 31, 2012, after four months of sobriety. Plaintiff had been depressed due to it being the anniversary of his daughter's murder. His drinking caused him to

develop a bad migraine so he went to the hospital, but he apparently blacked out and could not remember doing this. On examination, Plaintiff was cooperative and well-groomed, with good eye contact, logical thought process, goal-directed thought content, intact short- and long-term memory, good insight and impulsive judgment. His mood was depressed and his affect appropriate. Ms. Smith noted that Plaintiff's alcohol use was his greatest barrier to stable mental and physical health. T.652.

Dr. Southerland also saw Plaintiff on August 10, 2012. Plaintiff's affect was normal. He stated he had not had alcohol since his recent relapse. Dr. Southerland stressed that Plaintiff should not drink any alcohol and that he needed to continue therapy. T.673.

On August 29, 2012, Plaintiff saw NP Tantalo at RMHC and observed that his mood had been generally stable for the past month. T.656. He planned to obtain some seasonal road-work. He was compliant with his medications and reported that his counseling session with Ms. Smith had gone well and that he would meet with her regularly. He said that his alcohol abuse treatment program continued to provide adequate support. On examination, NP Tantalo noted that Plaintiff's mood was slightly dysphoric but appropriate overall, his affect was full-range, and his thought processes were organized and logical, with no suicidal ideation. Plaintiff's memory was intact, and his judgment and insight were adequate.

On September 28, 2012, Plaintiff informed Dr. Southerland that he had not been feeling depressed or sad at all for the past several weeks. T.669, 858-59. He was compliant with his Wellbutrin, but did not need medication to help him sleep. He currently was doing seasonal work for the Department of Transportation, which kept him very busy. He had not had a drink for several weeks. On examination, Plaintiff appeared comfortable, with a pleasant demeanor and calm affect. Dr. Southerland noted that Plaintiff was doing "really well" and that the "main factor" was that he was "NOT drinking and is working." T.669 (emphasis in original). Plaintiff's diabetes, hypertension, and depression all were well-controlled, which Dr. Southerland believed was directly related to his abstinence. Id.

On January 18, 2013, Plaintiff saw Dr. Hilary Yehling[2] at Culver Medical Group. Though he had stopped seeing his mental healthcare providers, he had continued taking his Wellbutrin, and his depressive symptoms were well controlled. T.666, 855. He was not drinking any alcohol. He admitted to having a few drinks over Christmas, but had not binged. He was walking a mile and a half every day with his new dog.

---

[2]

Dr. Hilary Southerland and Dr. Hilary Yehling appear to be the same person, as they share the same State professional license number. See Verification Search for Hilary Southerland, available at http://www.nysed.gov/coms/op001/opsc2a?profcd=60&plicno=261538&namechk=SOU (last accessed Mar. 4, 2016); Verification Search for Hilary Yehling, available at http://www.nysed.gov/coms/op001/opsc2a?profcd=60&plicno=261538&namechk=YEH (last accessed Mar. 4, 2016).

On February 6, 2013, Plaintiff had an appointment with an endocrinologist. He reported that he had no depression, anxiety, insomnia, memory loss, or pain. T.658-59.

On February 20, 2013, Plaintiff was discharged from RMHC. T.631-32. After attending a few therapy sessions, being evaluated by a psychiatrist, and starting a treatment program, he eventually stopped attending appointments and the program, and failed to respond to outreach from RMHC. His last appointment had been August 29, 2012.

On March 15, 2013, Plaintiff saw Dr. Karen Nead at CMG. He said he was avoiding alcohol after experiencing pancreatitis in February. T.852-53. Plaintiff was in no distress, with a normal affect and linear and appropriate thought.

On June 14, 2013, Plaintiff returned to see Dr. Yehling. T.662-63, 849-50. He had been hospitalized in April 2013, with alcohol-inducted pancreatitis. His last drink was two weeks ago. He tended to have difficulty with drinking when he was not working, and he was not planning to do seasonal work again until the fall.

Plaintiff returned to CMG several times in July 2013, with complaints of eye swelling, which was diagnosed as cellulitis. T.837-48. On July 6, 2013, Plaintiff presented with a tremor, and reported he had stopped drinking four days earlier, after consuming alcohol daily and having several binges. T.842. He quit because he soon was returning to seasonal work as a road-crew employee. On

examination, Plaintiff was in no acute distress, with appropriate and pleasant mood and affect, normal speech, ability to converse appropriately, good eye contact, no suicidal ideation, and fair judgment. T.839, 843, 847.

Plaintiff was admitted to inpatient rehabilitation at Unity Chemical Dependency Center on July 18, 2013, and completed the program on August 1, 2013. Dr. Tisha Smith, an addiction therapist, recommended that he continue with treatment. T.738.

On September 5, 2013, Plaintiff told his primary care doctor at CMG that he only had been drinking alcohol occasionally and had not binged since June of 2013. T.834.

Plaintiff was hospitalized on October 2, 2013, for alcohol withdrawal symptoms (tremors, sweating, anxiety, abdominal pain, and nausea. T.743, 775-810. He had been drinking 500 to 700 mL of rum each day, and had imbibed 300 mL of rum the night before his admission. He reported that he had no psychiatric issues. On examination he was cooperative with appropriate mood and affect. T.809. On discharge, it was recommended that he admit himself to an inpatient chemical dependency program the following day. T.776, 783.

On October 9, 2013, he was admitted to a one-week inpatient detoxification program. T.743. He told the doctor that on October 8, 2013, he had consumed 450 mL of rum.

-14-

Plaintiff was hospitalized from October 14, 2013, to October 20, 2013, due to acute pancreatitis, likely caused by alcohol abuse. T.740-74. On examination, Plaintiff was alert, oriented, and cooperative, in mild distress because of pain, with an appropriate mood and affect. T.772. On discharge, he was told to completely stop all alcohol consumption.

On November 19, 2013, Plaintiff saw his primary care physician, Dr. Michael Winter, complaining of radiating back pain down his left leg. T.815-17, 829-32. Straight-leg-raising test was positive, with tenderness to palpation at the left stenocleidomastoid and paraspinal muscles but no focal tenderness at the spinous processes. Dr. Winter diagnosed sciatica and prescribed physical therapy and naproxen. Plaintiff also was having difficulty falling asleep but not staying asleep, for which Dr. Winter recommended melatonin. On examination, Plaintiff was in no distress, with normal affect, and linear and appropriate thought.

On January 23, 2014, Plaintiff returned to Dr. Winter and reported that he had been consuming large quantities of alcohol in November and December of 2013. T.826. His last drink had been on January 10th. Plaintiff believed his "ego" was the trigger, as he would be abstinent for months and then think he could have one drink. He was feeling depressed two to four days a week with symptoms of anhedonia. On examination, Plaintiff was in no

distress, with normal affect and linear and appropriate thought. T.827. Dr. Winter again recommended alcohol cessation.

**B.     Medical Opinion Evidence**

**1. Consultative Psychologist**

On May 11, 2012, consultative psychologist Lynn Lambert, D.Psy. examined Plaintiff at the Commissioner' request. Plaintiff reported that he was currently attending an outpatient drug and alcohol treatment program. On examination, Plaintiff had a dysphoric, depressed, and moderately anxious affect, and a dysthymic mood. T.535. Dr. Lambert observed that he "worked very hard" on the tests regarding his attention and concentration and his recent and remote memory. She found that he had "intact" attention and concentration and "mostly intact" recent and remote memory. T.535. He had fluent and clear speech, coherent and goal directed thought-processes, "[a]verage" cognitive functioning, "[f]air to good" insight, and "[f]air" judgment. T.535. Plaintiff reported to Dr. Lambert that he often was so depressed and overwhelmed with "realistic life stressors and excessive worry" that he did not even think to eat, could not focus his mind to plan meals, and had little to no appetite. T.535. He occasionally did laundry and occasionally took public transportation, though he struggled to do shopping as a result of high anxiety levels, a tendency to lose focus when overwhelmed with stressors, and a tendency to have to trouble planning ahead. T.535. Plaintiff told

Dr. Lambert that he had "no socialization whatsoever." Although his mother, with whom he lived, was supportive, he had little to no contact with extended family. T.535-36. Plaintiff spent his time occasionally watching television and playing online computer games, going to various appointments, attending his drug and alcohol treatment program twice weekly, completing paperwork for the Department of Social Services and unemployment benefit applications, and occasionally going to AA meetings. T.536. Dr. Lambert diagnosed Plaintiff with (1) adjustment disorder, with mixed anxiety and depressed mood; and (2) "alcohol dependence and only very recent reported remission."[3] T.536. She stated that his prognosis was "guarded" given the level of daily psychosocial stress, "reported and apparent inability to manage psychosocial stressors without anxiety and depressive symptoms getting the better of him"; lack of social support system; and "[i]ncrease in diabetes and other medical problems in tandem with high levels of psychosocial stress." T.536. Dr. Lambert found that Plaintiff is able to manage his own funds. Id.

## 2. State Agency Review Psychiatrist

On May 21, 2012, state agency review psychiatrist Dr. R. Altmansberger reviewed Plaintiff's medical records, T.580-

---

[3]

    As noted in the summary of medical evidence, Plaintiff was admitted to Syracuse Behavioral Health from April 13, 2012, to April 21, 2012, for alcohol withdrawal and stabilization services (detoxification). T.558, 560. This was approximately a month before his appointment with Dr. Lambert.

93, and stated, "Impairment(s) Not Severe[.]" T.580. Accordingly, Dr. Altmansberger did not complete a Rating of Functional Limitations with regard to the "paragraph B" and "paragraph C" criteria. See T.590-93.

## II. The ALJ's Decision

### A.   Regulatory Standards

The Commissioner has promulgated a five-step sequential evaluation process for determining whether an individual is disabled. See 20 C.F.R. §§ 404.1520(a) and 416.920(a). Where, as here, there is evidence of a claimant's drug or alcohol abuse ("DAA"), the disability inquiry does not end with the five-step sequential evaluation. If the claimant is found disabled, the ALJ must determine whether the DAA is a contributing factor material to the determination of disability. 20 C.F.R. §§ 404.1535(a), 416.935(a). In this Circuit, the claimant bears the burden of proving that his DAA is not material to a determination that he is disabled. Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 123 (2d Cir. 2012). The Commissioner's finding on DAA materiality may be based on the record as a whole and does not require a medical opinion specifically addressing this issue. Id. at 126-27.

### B.   The ALJ's Disability and DAA Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 30, 2011, the alleged onset date. At step two, the ALL found that Plaintiff has the "severe"

impairments of history of sciatica, adjustment disorder with mixed anxiety and depressed mood, depressive disorder, and alcohol dependence. T.15. With regard to Plaintiff's heart disease, pancrceatitis, gastroesophageal reflux disease, migraines, diabetes and hypertension, the ALJ found that these conditions do not cause more than minimal limitation in Plaintiff's ability to perform basic work activities and are therefore not considered "severe."[4]

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the criteria of any listed impairment. The ALJ particularly considered Listings 12.04 and 12.09, and found that Plaintiff has "moderate" restrictions in activities of daily living and in social functioning, and "marked" limitations in maintaining concentration, persistence or pace. The ALJ also stated that Plaintiff "has experienced one to two episodes of decompensation. The record shows multiple relapses of alcohol abuse." However, because Plaintiff's mental impairments, including DAA, do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria of Listings

---

[4]

    Plaintiff does not challenge this finding on appeal.

12.04 and 12.09 are not satisfied.[5] The ALJ also summarily found that the "paragraph C" criteria were not satisfied.

The ALJ determined Plaintiff's residual functional capacity ("RFC"), *including* his alcohol abuse, allows him to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with some additional postural limitations.[6] Plaintiff can understand, remember, and carry out simple instructions and tasks; can occasionally interact with co-workers and supervisors; can rarely work in conjunction with co-workers; can have little to no contact with the general public; is unable to work in a low stress work environment; and is unable to consistently maintain concentration and focus for up to two hours at a time.

At step four, the ALJ noted that Plaintiff has past relevant work as an auto glass worker (DOT# 865.684-01 O; semi-skilled SVP 4; medium exertional work), which he is no longer able to perform.

At step five, the ALJ relied on the VE's hearing testimony to determine that considering Plaintiff's age, education, work

---

[5]

The ALJ's factual findings regarding the episodes of decompensation are unclear and contain an apparent internal consistency. The ALJ appears to be equating Plaintiff's alcohol binges and subsequent hospitalizations with episodes of decompensation, and it is clear from the record that Plaintiff has experienced well more than "one to two" such episodes. In the next sentence, the ALJ curiously states that Plaintiff has experienced "multiple" relapses. It is unclear how the ALJ found that such "multiple" relapses, which occurred as frequently as every other month, could not be considered "repeated." However, Plaintiff does not advance such an argument on appeal.

[6]

Because Plaintiff does not challenge the physical component of the ALJ's RFC assessment, the Court omits discussion of it here.

experience, and RFC including DAA, there are no jobs that exist in significant numbers in the national economy that he can perform.

Because of Plaintiff's DAA, the ALJ continued past step five and found that if he ceased abusing alcohol, the remaining limitations would cause more than a minimal impact on his ability to perform basic work activities. Therefore, he would continue to have a severe impairment or combination of impairments, but not one that would meet or medically equal a listed impairment. Specifically, with regard to the "paragraph B" criteria of Listings 12.04 and 12.09, Plaintiff would have only "mild" restriction in activities of daily living; "moderate" difficulties in social functioning; "mild" difficulties in maintaining concentration, persistence or pace; and he would experience no episodes of decompensation.

The ALJ then determined Plaintiff's RFC *without* alcohol abuse and found that if he stopped drinking, he would have same physical RFC, and would still be able to occasionally interact with co-works, to rarely work in conjunction with co-workers, to and have little to no contact with the general public. However, the ALJ found, Plaintiff would be able to work in a low stress work environment and would be able to consistently maintain concentration and focus for up to two hours at a time.

Although a person with the above RFC still could not perform Plaintiff's past relevant work, the VE had testified that such an

individual would be able to perform the requirements of representative occupations such as battery tester and gate guard. The ALJ relied on the VE's testimony to find Plaintiff's impairments not disabling in the absence of his alcohol abuse.

## DISCUSSION

### I. Standard of Review

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, a district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)). "Failure to apply the correct legal standards is grounds for reversal." Townley, 748 F.2d at 112.

## II. Plaintiff's Contentions

### A. Error in Assessing Plaintiff's RFC in the Absence of Alcohol Abuse

Plaintiff contends that the ALJ erred in assessing his RFC in the absence of alcohol abuse and in finding that his alcohol abuse was "material" to the finding of disability.

#### 1. Error in Evaluating Dr. Lambert's Opinion

According to Plaintiff, the ALJ mischaracterized Dr. Lambert's opinion as relating to a period of time when Plaintiff was actively abusing alcohol. The ALJ specifically noted that Plaintiff "reported [to Dr. Lambert] that he was currently attending an outpatient drug and alcohol treatment program." T.22. Previously, on April 13, 2012, Plaintiff had entered an inpatient 9-day detoxification program. He was discharged April 21, 2012, which was approximately three weeks before Dr. Lambert examined him on May 11, 2012, and then began the outpatient treatment program. Dr. Lambert noted that Plaintiff's alcohol dependence was in a "very recent reported remission." T.536. Thus, it appears clear that Dr. Lambert's opinion was issued during a period, albeit brief, during which Plaintiff was abstinent from alcohol. Plaintiff relatedly argues that Dr. Lambert's opinion contemplates a level of functioning that was significantly more impaired than the RFC that the ALJ assessed for Plaintiff in the absence of alcohol abuse. The Court disagrees, as explained further below.

The crucial portion of the ALJ's RFC assessment in the absence of alcohol abuse—the part that determined whether Plaintiff was disabled—is that *in the absence of* alcohol abuse, the ALJ found that Plaintiff has the ability to consistently maintain concentration and focus for up to 2 hours at a time, and work in a low stress environment (i.e., one which has no supervisory duties, requires no independent decision-making, has no strict production quotas, and has only minimal changes in work routine and processes). See T.21-23. Dr. Lambert opined that her

> current findings do appear consistent with [Plaintiff's] allegations of serious stress-related problems and substance abuse problems, likely to compromise functioning at this time. *Although [Plaintiff] appeared very capable of performing simple tasks independently and maintaining attention and concentration during basic activities*, he does appear moderately to seriously challenged to learn new tasks and perform complex tasks independently, *relate adequately with others, and appropriately deal with stress at this time, all due to, as stated earlier, daily high and reportedly overwhelming levels of psychosocial stress, as well as only recently having achieved sobriety.*

T.536 (emphases supplied). Dr. Lambert's clinical findings regarding Plaintiff's concentration and recent and remote memory skills, see T.535,[7] support the ALJ's finding that Plaintiff, when he is not abusing alcohol, has the ability to maintain concentration and focus for up to two hours at a time. In addition, support for this is found in Dr. Lambert's observation that he

---

[7]

Plaintiff correctly performed all counting, calculations, and serial 3s exercises, remembered 3 of 3 objects immediately and after five minutes, and recited 3 and 4 digits forward and 2 of 3 digits backwards. T.535.

"appeared very capable" of performing simple tasks and maintaining focus. This also is consistent with the ALJ's restriction of Plaintiff to work involving simple instructions and tasks.

Plaintiff argues that Dr. Lambert's finding that he was "moderately to seriously  challenged" in his abilities to "relate adequately with others, and appropriately deal with stress at this time[,]" T.536, contradicts the ALJ's assessment that Plaintiff can work in a low stress environment and occasionally interact with co-workers. However, the Court cannot find that the ALJ was unreasonable in interpreting this opinion to mean that these challenges would be lessened if Plaintiff maintained sobriety. It should be noted that at the time of Plaintiff's appointment with Dr. Lambert, he only had been sober for at most three weeks; as Dr. Lambert noted, his alcohol dependence was in "only very recent reported remission." T.536. Dr. Lambert also consistently referred to Plaintiff's "stress-related problems _and_ substance abuse problems," not to his medically determinable impairment of adjustment disorder, as being the factors seriously compromising his functioning. E.g., T.536. It was not unreasonable for the ALJ to conclude that if Plaintiff's alcohol abuse problems were eliminated from the picture, Dr. Lambert's opinion allowed for the RFC without DAA that the ALJ assessed.

The Court agrees with the Commissioner that the ALJ's RFC without DAA and his reading of Dr. Lambert's opinion are supported

by the other medical evidence of record, including Plaintiff's subjective statements about his symptoms to his doctors and therapists, and their clinical observations of him. See generally Defendant's Memorandum of Law (Dkt #12-1) at 25-27 (compiling evidence; citations to record omitted). For instance, he almost always was noted to have a full, appropriate, congruent, calm, or normal affect. T.226-27, 229, 619, 628, 652, 654, 656, 669, 673, 676, 682, 772, 809, 827, 831, 835, 843, 847, 853); but see T.259 (anxious); T.678 (flat). Likewise, he was usually found to have fair or fair-to-good insight and judgment, although there is one finding of "somewhat poor" insight and one finding of "impulsive" judgment. T.227, 652.

While Plaintiff draws attention to statements he made to his treatment providers in July of 2012, about increasing symptoms of depression, but neglects to mention that Dr. Southerland increased Plaintiff's Wellbutrin from 150 mg to 300 mg at that time. Within a month or two, Plaintiff reported no longer feeling depressed. See, e.g., T.656 (8/29/12; reporting to NP Tantalo that his "mood has been generally stable since" last month), T.669 (9/28/12; reporting to Dr. Yehling that he was "[n]ot feeling at all down, depressed or sad for several weeks"). Going forward, Plaintiff continued to report good control of his depression on Wellbutrin. See T.658, 666, 800, 842. While he did note anxiety on October 6, 2013, it was a symptom of alcohol withdrawal following a binge.

Likewise, he complained of being depressed several days a week in January 2014, but this was very soon after he reported several weeks of drinking alcohol in large quantities. T.826.

Most tellingly, Plaintiff's treatment providers' observations of Plaintiff when he was abstinent support the ALJ's RFC without alcohol abuse. For instance, in September 2012, Dr. Yehling stated that Plaintiff was doing "really well," primarily due to the fact he was "NOT drinking." T.669 (emphasis in original). Similarly, in January 2012, and March 2012, Dr. Southerland opined that alcohol, along with diabetes, were Plaintiff's main problems. T.244. However, Dr. Yehling observed in September 2012, that Plaintiff's diabetes mellitus, hypertension, and depression were "well controlled . . . all of which [she] think[s] are directly related to his abstinence." T.669. In August 2012, one of Plaintiff's therapists noted that Plaintiff's alcohol use was his "greatest barrier for [sic] stable mental and physical health." T.652.

The Court finds that the ALJ did not commit legal error in evaluating Dr. Lambert's opinion, and his interpretation of it is supported by substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]" Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quotation marks omitted). Substantial evidence likewise supports the ALJ's conclusion that, if Plaintiff were abstinent from alcohol, the limitations from his impairments would improve to the

point that he would not be disabled. Faced with this quantum of evidence, the Court must uphold the ALJ's findings and ultimate determination that he Plaintiff would not be disabled were he to discontinue his abuse of alcohol. See Cage, 692 F.3d at 127.

### B.   Credibility Assessment

Plaintiff also urges reversal on the basis that the ALJ erred in evaluating the credibility of his subjective complaints. As noted above, Plaintiff has not taken issue with the ALJ's assessment of his physical RFC. Accordingly, Plaintiff's credibility argument necessarily is limited to the ALJ's evaluation of the effects of his mental impairments. Here, the ALJ concluded that Plaintiff's statements concerning the limiting effects of his mental impairments when he was abusing alcohol *were* credible, but were not entirely credible when he testified his limitations during periods that he was abstinent from alcohol. See T.17, 23.

According to Plaintiff, the ALJ drew an adverse inference against him based on his completion of an inpatient detoxification and treatment program. In particular, Plaintiff notes the comment by Dr. Smith that Plaintiff had completed her clinic's program through tremendous discipline and self-discovery. T.20 (citing T.738). The ALJ cited this comment as one piece of evidence to support his finding that Plaintiff would have only mild difficulties with maintaining concentration, persistence, and pace, if he ceased abusing alcohol T.20. The Court agrees with Plaintiff

that it is not proper for an ALJ to take a claimant's "willingness and ability to participate in his own psychiatric care and use[ ] it against him." Kane v. Astrue, No. 11-CV-6368 MAT, 2012 WL 4510046, at *17 (W.D.N.Y. Sept. 28, 2012). Here, however, the ALJ cited to other instances of Plaintiff's improved functioning in the absence of alcohol abuse to support his analysis of the "paragraph B" criteria. There accordingly was substantial evidence for this finding, notwithstanding the ALJ's reliance on the comment from Plaintiff's addiction therapist Dr. Smith.

Plaintiff's own statements about the effects of alcohol abuse on his social functioning support the ALJ's credibility assessment. For instance, in his Function Report, when asked if he had any problems getting along with family, friends, neighbors, or others, he replied "yes" and the explanation he gave was, "due to alcoholism." T.187. He did not cite other factors besides his alcohol abuse as affecting his ability to relate with people. In February 2012, Plaintiff reported that his drinking was interfering with his job, and noted that his hours had been reduced to part-time because of "[alcohol] use and missing a lot of work." T.228. Furthermore, the only time Plaintiff engaged in an act of self-harm was while he was extremely intoxicated. See T.228, 578.

The Court does not find that the ALJ mischaracterized the record. Furthermore, the Court must agree with the Commissioner that substantial evidence underpins the ALJ's credibility

assessment. Accordingly, the Court finds no basis to reverse the ALJ's decision to discount Plaintiff's subjective complaints regarding his limitations while not actively drinking. <u>See</u> <u>Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.</u>, 728 F.2d 588, 591 (2d Cir. 1984) (upholding ALJ's decision to discount claimant's credibility because "there was substantial evidence in the record as a whole to support the Secretary's determination that Aponte was not disabled by reason of her physical impairments or pain").

## CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's determination was not erroneous as a matter of law and was supported by substantial evidence. Accordingly, the Commissioner's determination is affirmed. Defendant's Motion for Judgment on the Pleadings (Dkt #12) is granted, and Plaintiff's Motion for Judgment on the Pleadings (Dkt #10) is denied. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**S/Michael A. Telesca**
_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:    March 8, 2016
          Rochester, New York.